[Cite as *State v. Pettit*, 2012-Ohio-3057.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT


|  |  |  |
|---|---|---|
|  | : | JUDGES: |
| THE STATE OF OHIO | : | Patricia A. Delaney, P.J. |
|  | : | William B. Hoffman, J. |
| Plaintiff-Appellee | : | Julie A. Edwards, J. |
|  | : |  |
| -vs- | : | Case No. 11CA0108 |
|  | : |  |
|  | : |  |
| MICHAEL PETTIT | : | O P I N I O N |
| Defendant-Appellant | | |


CHARACTER OF PROCEEDING:        Criminal Appeal from Licking County
Court of Common Pleas Case No.
11CR00318

JUDGMENT:        Affirmed

DATE OF JUDGMENT ENTRY:        June 29, 2012

APPEARANCES:

For Plaintiff-Appellee        For Defendant-Appellant

KENNETH W. OSWALT        WILLIAM T. CRAMER
Licking County Prosecutor        470 Olde Worthington Road, Ste. 200
       Westerville, Ohio 43082

BY: CHRISTOPHER REAMER
Assistant Prosecutor
20 South Second Street, 4th Floor
Newark, Ohio 43055

*Edwards, J.*

**{¶1}** Defendant-appellant, Michael Pettit, appeals his conviction and sentence from the Licking County Court of Common Pleas on one count of burglary. Plaintiff-appellee is the State of Ohio.

<u>STATEMENT OF THE FACTS AND CASE</u>

**{¶2}** On July 1, 2011, the Licking County Grand Jury indicted appellant on one count of burglary in violation of R.C. 2911.12(A)(1), a felony of the second degree. At his arraignment on July 12, 2011, appellant entered a plea of not guilty to the charge.

**{¶3}** Pursuant to an Entry filed on September 1, 2011, the trial court consolidated the burglary case with Case No. 11 CR 00404. Appellant had been charged in Case No. 11 CR 00404 with burglary and domestic violence.

**{¶4}** A bench trial was held on October 12, 2011. At the trial, Danielle Bishop testified that she lived with her mother, Laurie Bishop, in Newark, Ohio. She testified that she had resided with her mother since February of 2011, and that, prior to such time, she had lived with appellant, who was her boyfriend. The two moved in together in July of 2010 and lived together in an apartment for approximately one and a half years. During most of the time, Danielle Bishop paid all of the expenses because appellant was only sporadically employed.

**{¶5}** According to Danielle Bishop, the two fought all of the time. She testified that most of the time, their arguments were verbal rather than physical. After tiring of their continual fighting and screaming, Danielle Bishop moved out of the apartment and in with her mother in February of 2011. Since her name was the only name on the apartment lease, she told appellant that she was going to break the lease and that he

needed to remove his belongings out of the apartment. Danielle Bishop testified that she left the majority of her personal belongings at the apartment.

{¶6}   When asked, Danielle Bishop testified that she had a house key to her mother's house prior to February of 2011, and that she never gave appellant permission to have possession of the keys. She testified that she had the keys with her when she left the apartment. According to Danielle Bishop, her mother did not like appellant and did not want him in her home. She testified that her mother did not even want her talking to appellant and that appellant knew that he was not welcome in her mother's home. She testified that, after February of 2011, appellant had tried to come over a couple of times and that she told him that he needed to leave.   She also testified that if her mother saw appellant, she would tell appellant to leave and that she never allowed appellant inside the house.

{¶7}   On May 6, 2011, Danielle Bishop was getting ready to leave to go out of town when appellant showed up at the house. Appellant told her that he wanted to say goodbye and to talk to her for a few minutes. The two had been fighting all day because Danielle Bishop told him that she was going out of town. When she returned home from her trip, the front door frame was broken and the door would no longer lock. The door was repaired on May 13, 2011. On the same day, Danielle Bishop was going out of town and saw appellant standing outside the house at the end of the driveway yelling at her to come and talk to him. She stayed inside.

{¶8}   On June 21, 2011, Danielle Bishop returned to her mother's house after a trip to Los Angeles. At that point, she was still communicating with appellant by phone. During the night, Danielle Bishop was awakened in her basement bedroom by her

mother screaming and yelling for her to get out of the house. When she ran to the bedroom door, appellant was running down the steps to the basement. Danielle Bishop ran up the steps to the living room and by the time she made it there, appellant was on his way back up. When she tried to grab his arm, appellant pushed her arm away and ran out the door. During a check of her bedroom, Danielle Bishop discovered that her Blackberry phone was missing and that an old wallet of hers was in the middle of the floor. She testified that she had not been able to locate the wallet in the prior months and that it was not there when she went to bed. There was a cut in the window screen that had not been there prior to June 21, 2011

{¶9}   Appellant was arrested on June 23, 2011. Danielle Bishop testified that between June 21, 2011, and June 23, 2011, she was leaving for work one morning and appellant was in the neighbor's backyard. He told her that he was going to give her the phone back and that he just wanted to talk to her. Danielle Bishop testified that her mother then shoved her into the car and told appellant to leave.

{¶10}  When asked, Danielle Bishop admitted that she had continued talking with appellant since his arrest and had visited him in jail three times. She testified that appellant encouraged her to suggest that she had left the back door open on June 21, 2011.

{¶11}  On cross-examination, Danielle Bishop testified that she had gone to see appellant in jail because she was mad. She testified that she also went to see appellant on his birthday because she knew no one else was going to be able to come. She accepted phone calls from appellant 10 or 12 times. She testified that she was willing to still have appellant be a part of her life, but that she had stopped visiting him in jail after

the detectives and prosecutors told her to do so.  On redirect, Danielle Bishop testified that appellant never had reason to believe that he had consent to be present at her mother's house.

{¶12} Laurie Bishop, Danielle's mother, testified that she made it clear to appellant that he was not welcome at her house and that he was to leave Danielle alone. She testified that they called the police a couple of times when appellant was at the door and that, to her knowledge, appellant never had a key to her house. Between February of 2011, and June 21, 2011, she saw appellant near her house approximately 10 to 12 times.

{¶13} On June 21, 2011, Laurie Bishop left the house to pick up her daughter at the airport. As she was leaving, she saw appellant in the shadows beside the house and he told her that he needed to talk to Danielle. Laurie Bishop then told appellant to leave and he proceeded to pound on the door to the house. He then started coming toward Laurie Bishop's car and she picked up her phone and called the police. At the time Laurie Bishop left the house, the house was secure. After picking up Danielle, the two returned home and went to bed. Because her door had been kicked in a few weeks earlier, Laurie Bishop was sleeping on the couch in the living room rather than in her attic bedroom. At some point during the night, her dogs started barking and she got off of the couch and went into the dining room where she encountered appellant. When Laurie Bishop asked appellant what he was doing there, he told her that he was there to get his stuff and that he was going to Chicago. She then ordered him to leave, but appellant did not do so and went downstairs to Danielle's bedroom.   The following is an excerpt from Laurie Bishop's testimony:

**{¶14}** "Q. Now, you're certain you told him to get out when you first confronted him in the house?

**{¶15}** "A. Oh, absolutely, absolutely.  That's the first thing I said to him.  I said, 'What are you doing here?  Get out of my house.'  He said, 'I'm just here to get my stuff. I'm going to Chicago.'"  Transcript at 61-62.

**{¶16}** When the police arrived, Laurie Bishop discovered a chair outside on the deck under her kitchen window and a damaged window screen lying on the deck. The screen, which was sliced, had not been damaged before June 21, 2011. During the early morning hours of January 21, 2011 into January 22, 2011, appellant was sending continuous text messages to Laurie Bishop's phone and leaving voicemail messages saying that he was sorry, that he did not want to go to jail and threatening to commit suicide.

**{¶17}** Detective Todd Green of the Newark Police Department testified that when he went to appellant's apartment, he observed a Blackberry phone in the living room area. The Detective testified that during an interview, appellant told them that he went over to the house because he missed Danielle Bishop who was in Los Angles and that after Laurie Bishop saw him, he left and then later returned. At one point, appellant opened the window to the house to let the air conditioner make noise because the dogs were barking. Appellant indicated that he assumed that Laurie Bishop was sleeping upstairs and that he went through a back door and she surprised him. While, at one point during the interview, appellant said that Danielle Bishop was going to leave the back door unlocked, he subsequently told the Detective that he knew he had screwed up, that he should not have been there, and that Laurie Bishop had told him that he

could not be there. Appellant told the Detective that he was going to go into the house and wake Danielle Bishop up and surprise her.

{¶18} At trial, appellant admitted that Laurie Bishop did not like him and that she had made it clear that she did not want him around her daughter. Appellant testified that on June 21, 2011, he believed that Laurie Bishop was in her room in the attic asleep and that he wanted to go into the house and talk to Danielle and give her some money. Appellant testified that the back door was unlocked and that after he entered the house, he was confronted by Laurie Bishop and told to leave. However, appellant did not leave immediately, but rather ran downstairs to Danielle Bishop's room. Appellant testified that he grabbed Danielle Bishop's phone because she would have to come see him if he had the same and that he did not intend to keep or steal the phone. The following testimony was adduced when he was asked what he did with the phone:

{¶19} "A. I took the phone back to the house with me. I went to my brother's house to see my son. I walked there, walked back home. Tried to get a hold of Danielle through Laurie's cell phone so I could talk to her and let her know that, you know, I just wanted you to come pick the phone up, take this money and discuss me leaving to go to Chicago. And obviously Laurie's not letting me talk to Danielle at this point.

{¶20} "So I write her a note. I made a picture frame with her and I from my brother's wedding, it said 'Memories' on it. I took it to the house. At this time it started sprinkling. I wanted to leave the phone underneath the windshield wiper with the letter and the picture frame, but at this time it started sprinkling so I waited in the neighbor's yard, which is not occupied.

**{¶21}** "I just sat down out back and waited, because I knew that Danielle would be going to work, I'd return the phone. When she came out of the house I said, 'Princess,' you know, and she turned and looked at me. I said, 'I just want to give you' – Laurie came off the front porch before we could even discuss anything, and started screaming for me to get away from her and she was calling the cops again.

**{¶22}** "You know, I just said, 'Why? I don't understand. Can I just give her the thing?' I just ran away, because it was just, 'You better leave now,' so I ran away.

**{¶23}** "Q. What did you do with the phone then?

**{¶24}** "A. Took it back to the house." Transcript at 119-120.

**{¶25}** Appellant also testified that when he went into Laurie Bishop's house on the date in question, he did not intend to commit any crime. He testified that he had no intention of keeping the phone or of depriving Danielle of the same.

**{¶26}** At the conclusion of the evidence, the trial court found appellant guilty of burglary in the case sub judice, but not guilty of the charges in Case No. 11 CR 00404. As memorialized in a Judgment Entry filed on October 12, 2011, the trial court sentenced appellant to six (6) years in prison.

**{¶27}** Appellant now appeals, raising the following assignments of error on appeal:

**{¶28}** "I. APPELLANT WAS DEPRIVED OF HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS BECAUSE THE PROSECUTION FAILED TO PRESENT SUFFICIENT EVIDENCE THAT HE COMMITTED A BURGLARY.

{¶29} "II. THE TRIAL COURT'S FINDING THAT APPELLANT COMMITTED A BURGLARY WAS NOT SUPPORTED BY THE WEIGHT OF EVIDENCE.

{¶30} "III. TRIAL COURT ABUSED ITS DISCRETION IN SENTENCING APPELLANT TO SIX YEARS OF INCARCERATION FOR A RELATIVELY MINOR BURGLARY OFFENSE."

I, II

{¶31} Appellant, in his first two assignments of error, argues that his conviction for burglary is against the manifest weight and sufficiency of the evidence. We disagree.

{¶32} When reviewing the sufficiency of the evidence, our inquiry focuses primarily upon the adequacy of the evidence; that is, whether the evidence, if believed, reasonably could support a finding of guilt beyond a reasonable doubt. See *State v. Thompkins,* 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541, *State v. Jenks,* 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991). The standard of review is whether, after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *Jenks,* supra.

{¶33} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the

judgment." *Thompkins,* supra at 387, citing *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983). Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212, (1967), syllabus 1.

**{¶34}** Appellant was convicted of burglary in violation of R.C. 2911.12(A)(1). Such section states as follows: "(A) No person, by force, stealth, or deception, shall do any of the following: (1) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense."

**{¶35}** Appellant now contends that there was insufficient evidence that he intended to commit any crimes. Appellant notes that although he took Danielle Bishop's phone, he left her several messages afterwards that he was not going to keep the phone, but that he just wanted to talk to her before he left for Chicago. On such basis, appellant also argues that his conviction is against the manifest weight of the evidence.

**{¶36}** However, after viewing the evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, we find that any rational trier of fact could have found all the essential elements of the offense of burglary beyond a reasonable doubt. There was evidence that appellant trespassed in Laurie Bishop's house, by force, stealth or deception and while inside knowingly took Danielle Bishop's cell phone. While appellant testified that that he never intended to keep or steal the

phone, the trial court, as trier of fact, was in the best position to assess his credibility. We note that the trial court, in convicting appellant, noted that it had listened to tapes from appellant's jail visits with Danielle Bishop and that appellant had "spent most every jail visit asking Ms. Bishop to lie under oath for him, to sign a statement to say that she gave him permission to be in the house and left the door unlocked. So I don't have any problem believing that [appellant] could lie for himself here…" Transcript at 134. Clearly, the trial court did not believe appellant's testimony as to his intent. Moreover, as noted on the record by the trial court, appellant's "taking of the phone,…to get her [Danielle Bishop] to talk to him constitutes theft by holding the item or with purpose to restore only upon payment of, reward or other consideration, such as contact with her, forcing her to see him." Transcript at 134.

**{¶37}** Based on the foregoing, we find that appellant's conviction for burglary was not against the sufficiency or manifest weight of the evidence. As noted by appellee, there was evidence that appellant, while committing a trespass, committed a theft of the phone.

**{¶38}** Appellant's first and second assignments of error are, therefore, overruled.

III

**{¶39}** Appellant, in his third assignment of error, argues that the trial court abused its discretion in sentencing him to six (6) years in prison for a minor burglary.

**{¶40}** We note that an abuse of discretion connotes more than a mere error of judgment; it implies that the court's attitude is arbitrary, unreasonable, or unconscionable. *State v. Adams,* 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

**{¶41}** The trial court, in convicting and sentencing appellant, noted that appellant had prior felony convictions and had encouraged Danielle Bishop to lie. The trial court noted that appellant had 15 prior criminal charges, five of which were originally charged as felonies. At trial, appellant testified that he had two prior felony convictions for possession of drugs. While one of the convictions occurred in 2005, the other occurred in 2009.  The trial court further found that appellant did not have any redeeming qualities and manipulated people who tried to help him.  Appellant himself testified that Danielle Bishop was working two jobs and supporting him while he was sporadically employed. Appellant had started a relationship with her upon his release from prison.

**{¶42}** Based on the foregoing we find that the trial court did not abuse its discretion in sentencing appellant to six (6) years in prison. The trial court's decision was not arbitrary, unconscionable or unreasonable.

**{¶43}** Appellant's third assignment of error is, therefore, overruled.

**{¶44}** Accordingly, the judgment of the Licking County Court of Common Pleas is affirmed.


By: Edwards, J.

Delaney, P.J. and

Hoffman, J. concur

_____

_____

_____

JUDGES

JAE/d0412

[Cite as *State v. Pettit*, 2012-Ohio-3057.]

IN THE COURT OF APPEALS FOR LICKING COUNTY, OHIO

FIFTH APPELLATE DISTRICT

STATE OF OHIO                                :
                                             :
                    Plaintiff-Appellee       :
                                             :
                                             :
-vs-                                         :        JUDGMENT ENTRY
                                             :
MICHAEL PETTIT                               :
                                             :
                    Defendant-Appellant      :        CASE NO. 11CA0108


     For the reasons stated in our accompanying Memorandum-Opinion on file, the

judgment of the Licking County Court of Common Pleas is affirmed.  Costs assessed to

appellant.


                                             _____

                                             _____

                                             _____

                                                          JUDGES